**BRADFORD HOSPITAL d/b/a Bradford Regional Medical Center, Plaintiff,**

v.

**Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Defendant.**

**No. Civ.A. 99-171 ERIE.**

United States District Court, W.D. Pennsylvania.

June 5, 2000.

the 1998 decision to place plaintiff on restricted duty.

474

M. Theresa Creagh, Terrence J. O'Rourke, Nash & Company, Pittsburgh, PA, for Plaintiff.

Jessica Lieber Smolar, United States Attorney's Office, Pittsburgh, PA, Erinn Weeks, Department of Health and Human Services, Office of General Counsel, Washington, DC, for Defendant.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

This is a civil action pursuant to 42 U.S.C. § 1395. Plaintiff Bradford Hospital seeks judicial review of a final decision of the Secretary of Health and Human Services denying Plaintiff's request for a redetermination of its hospital-specific rate as untimely. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, the Plaintiff's motion is granted and the Defendant's motion is denied.

### I. BACKGROUND

#### A. *The Medicare Statute and Its Regulations*

In 1965, Congress enacted Medicare, which is a federally funded health insurance program. *See* 42 U.S.C.A. §§ 1395–1395zz (West 1992 & Supp.1999). Part A of the program, which is at issue in this case, provides hospital insurance for the elderly and disabled. *See id.* § 1395d. Under it, the federal government reimburses eligible hospitals for the "reasonable costs" of covered services provided to Medicare beneficiaries. *See id.*

The Secretary of the Department of Health and Human Services has delegated much of the administration of the Medicare program to the Administrator of the Health Care Financing Administration

("HFCA"). In this regard, however, the HFCA may contract with private insurance companies, which are referred to as "fiscal intermediaries," to assist in the administration of the program. *See id.* § 1395h. The intermediaries perform a variety of functions, including determining the amount of reimbursement due providers and making the actual payments to providers. If a provider is dissatisfied with the intermediary's determination, it may request a hearing before the Provider Reimbursement Review Board ("the Board"), an administrative body within the Department of Health and Human Services. *See id.* § 1395oo(a). The Board's decision is final unless the Administrator reverses, affirms or modifies the decision within sixty days. *See id.* Providers may obtain judicial review of any "final decision" of the PRRB or of the Administrator. *See id.* § 1395oo(f)(1).

Prior to 1983, hospitals were reimbursed retroactively for the actual reasonable costs of furnishing care to Medicare patients. *See Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 580 (3d Cir.1991); *Kean v. Heckler,* 799 F.2d 895, 897 (3d Cir.1986). At the end of each fiscal year, the hospital would submit a cost report detailing their actual costs of treating the patients and the intermediary would perform an audit to determine whether the costs were reasonable. *See Monongahela Valley,* 945 F.2d at 580. In 1983, however, Congress enacted the Prospective Payment System, under which hospitals are reimbursed prospectively for their treatment of Medicare beneficiaries on the basis of predetermined fixed rates which vary according to the type of services rendered. *See* Social Security Amendments of 1983, Pub.L. No. 98–21, § 601, 97 Stat. 65, 152–62 (codified at 42 U.S.C. §§ 1395ww(d)(e)); *see also Kean,* 799 F.2d at 897. The purpose of this new system was "to reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost-effective hospital practices." H.R.Rep. No. 98–25, 1st Sess. 132 (1983), *reprinted in* 1983 U.S.Code Cong. & Admin.News 143, 187; *see also County of Los Angeles v. Shalala,* 192 F.3d 1005, 1008 (D.C.Cir. 1999).

Initially, the Prospective Payment System was limited to operating costs of inpatient hospital services.[1] However, in 1987, Congress directed that the HCFA extend the system to capital-related expenses [2], effective in 1991. *See* Pub.Law 100–203 § 4006(b)(1) (1987) (amending 42 U.S.C. § 1395ww(g)(1)(B)). Accordingly, the HCFA promulgated regulations that established a standard rate for capital costs. The standard rate was not effective immediately, however; the regulations provided for a ten-year transition period during which the amount of a hospital's capital reimbursement would be determined by the provider's hospital-specific rate. *See* 42

---

1. The Medicare statute defines "operating costs of inpatient hospital services" as follows:

 For purposes of this section, the term "operating costs of inpatient hospital services" includes all routine operating costs, ancillary service operating costs, and special care unit operating costs with respect to inpatient hospital services as such costs are determined on an average per admission or per discharge basis (as determined by the Secretary), and includes the costs of all services for which payment may be made under this title ... that are provided by the hospital ... to the patient during the 3 days ... immediately preceding the date of the patient's admission if such services are diagnostic services (including clinical diagnostic laboratory tests) or are other services related to the admission (as defined by the Secretary). Such term does not include costs of approved educational services, a return on equity capital, other capital-related costs (as defined by the Secretary for periods before October 1, 1987), or costs with respect to administering blood clotting factors to individuals with hemophilia.

 42 U.S.C.A. § 1395ww(a)(4) (West Supp. 1999).

2. The regulations define capital-related costs as including depreciation, interest, taxes, insurance and similar expenses for plant and fixed equipment, and for movable equipment. *See* 42 C.F.R. § 413.130 (1999).

C.F.R. §§ 412.308, 412.324(a) (1999); 56 Fed.Reg. 43,358 (1991). The hospital-specific rate is based on the hospital's capital cost per discharge during its 1990 cost-reporting period. *See* 42 C.F.R. §§ 412.324(a), 412.344.

The regulations provide that two different payment methodologies apply to capital-related costs: the "fully prospective payment" methodology and the "hold harmless" methodology. 42 C.F.R. § 412.324(a); 56 Fed.Reg. at 43,363. If the hospital-specific rate is less than the standard federal rate, then Medicare reimburses the hospital under the fully prospective payment methodology. *See* 42 C.F.R. §§ 412.324(a), 412.340; 56 Fed.Reg. at 43,363. This methodology pays a blend of the hospital-specific rate and the federal rate; each year of the transition period, the federal rate proportion increases and the HSR proportion decreases, until the hospital is paid based on 100% of the federal rate in the year 2001. *See* 42 C.F.R. § 412.340; 56 Fed.Reg. at 43,363. Conversely, if the hospital-specific rate exceeds the federal rate, then Medicare reimburses the hospital under the hold-harmless payment methodology. *See* 42 C.F.R. §§ 412.324(a), 412.344; 56 Fed.Reg. at 43,363. This methodology pays the higher of either 100% of the federal rate or the sum of 85% of reasonable costs for old capital plus an amount for new capital based on a proportion of the federal rate. *See* 42 C.F.R. § 412.344; 56 Fed.Reg. at 43,363.

Additionally, the amount of the reimbursement is affected by whether the costs are categorized as old capital or new capital. Old capital costs are "capital-related costs for land and depreciable assets that were put in use for patient care on or before ... December 31, 1990." 42 C.F.R. § 412.302(b). Conversely, new capital costs are "capital-related costs ... that are related to assets that were first put in use for patient care after December 31, 1990." *Id.* § 412.302(a). Some assets put into use for patient care after December 31, 1990

can be considered old capital; these costs are called "obligated capital costs." *Id.* § 412.302(c). Obligated capital costs are costs for which the hospital became legally obligated prior to December 31, 1990 and which would be put into use before October 1, 1994. *See id.*; 56 Fed.Reg. at 43,362; Provider Reimbursement Manual ("PRM") § 2807.3.C.1.

Hospitals seeking recognition of obligated capital are required to notify their intermediary in writing of the existence of the obligated capital and submit certain supporting documents by the later of October 1, 1992, or within 90 days after the hospital's first cost reporting period beginning on or after October 1, 1991. *See* 42 C.F.R. § 412.302(c)(1)(v); 56 Fed.Reg. at 43,393 (1991); PRM § 2807.3.C.1.c. The supporting documentation must include the binding agreement, a project description and an estimate of the total costs of the project. *See* 42 C.F.R. § 412.302(c)(1)(v).

After it receives the proper documentation, the intermediary is required to advise the hospital of its determination by the later of the close of the hospital's first 12 month cost reporting period under the capital prospective payment system or nine months after the date the hospital submitted its completed documentation. *See id.* § 412.302(c)(1)(vii)(B); 56 Fed.Reg. at 43,393–94; PRM § 2807.3.C.5. The purpose of the intermediary's deadline is to inform hospitals "in advance whether the project will be recognized as old capital." 56 Fed.Reg. at 43,393–94. The intermediary's determination, however, is contingent on the asset being put into use by October 1, 1994. *See* 42 C.F.R. § 412.302(c)(1)(vii)(C); 56 Fed.Reg. at 43,394; PRM § 2807.3.C.5.

Finally, a hospital paid under the fully prospective payment methodology may request that its hospital-specific rate be redetermined subsequent to the base period to reflect the addition of obligated capital and other changes in its costs for old capital. *See* 42 C.F.R. § 412.328(f); 56 Fed.Reg.

at 43,362; PRM § 2807.4.E. This request must be made "in writing no later than the date the cost report must be filed with the hospital's intermediary for the first cost reporting period beginning on or after October 1, 1991, or the cost reporting period that will serve as the new base period, whichever is later." 42 C.F.R. § 412.328(f)(1)(iii). The redetermination request must include (1) "the cost report for the new base period" and (2) "an estimate of the revised hospital-specific rate indicating that the new rate exceeds the hospital's current hospital-specific rate." Id. The hospital-specific rate may be redetermined through the later of a hospital's cost reporting period beginning in fiscal year 1994 or after obligated capital that qualifies as old capital has been put into use. See 42 C.F.R. § 412.328(f)(1)(ii); 56 Fed. Reg. at 43.362.

After it receives the request, the intermediary must decide whether to redetermine the rate and whether the methodology must be changed from fully prospective payment to hold harmless. First, if the intermediary determines that the redetermined rate is lower than the hospital's current rate, then it will deny the request. See PRM § 2807.4.E.4. This denial will be issued summarily if the estimated rate submitted by the hospital is lower than the current rate. See 57 FedReg. 39,746, 39,794–95 (1992); PRM § 2807.4.E.4. According to the HFCA, this will avoid "unwarranted requests" and relieve the intermediary of "an unnecessary administrative burden." 57 Fed.Reg. at 39,795. Second, if the intermediary determines that the redetermined rate exceeds the hospital's current rate but is lower than the federal standard rate, then the hospital will continue to receive payments under the fully prospective methodology but the new rate will be used in determining the payments. See PRM § 2807.4.E.6. Third, if the intermediary determines that the redetermined rate exceeds the current rate and the federal standard rate, then the hospital will be reimbursed according to the hold harmless methodology. See id.

## B. *Factual and Administrative History*

Prior to December 31, 1990, Bradford Hospital entered into several contracts for the construction of a four story addition onto the hospital and for numerous renovations. We will refer to this project as the "East Wing project" (AR 1273, 1287). The East Wing project was placed into use in the spring of 1992.

By letter dated May 22, 1992, the intermediary in this case, Blue Cross of Western Pennsylvania, issued an interim determination of Bradford Hospital's hospital-specific rate (Administrative Record "AR" at 901–02). It found that Bradford Hospital's capital base period was June 30, 1990 and that its interim hospital specific rate was $297.69 per discharge (AR 901). It concluded that the hospital-specific rate was lower than the federal rate and that reimbursement would be made according to the fully prospective payment method (AR 901). It also notified Bradford Hospital that if it believed it had capital costs that qualified as obligated capital, then it must submit supporting documentation to the intermediary within 90 days of the first affected cost period (AR 902). Subsequently, by letter dated August 24, 1992, the intermediary notified the hospital that the supporting documentation should include:

1. Board minute notes on the project which must include estimated cost of the project.

2. Certificate-of-need request and approval.

3. Loan agreement or bond purchase contract.

4. Architect or construction contract for the actual construction work.

5. Documentation of amounts expended for the project by December 31, 1990.

(AR 905). The letter also provided, "Failure to have this required information will not allow the FI to include these cost[s] as old capital." (AR 906)

On September 29, 1992, Bradford Hospital wrote a letter to the intermediary and enclosed the following documentation "for 'Old (Obligated) Capital' for Bradford Hospital":

1) List of all capital assets acquired between 07/01/90 and 12/31/90 including useful life and annual depreciation.

2) Letter from Bob Cummins Construction Co. relating to the demolition of the building (destroyed in fire) and construction of new parking lot. The balance of the $167,565 that was capitalized was for additional blacktop work (done by Cummins) and sealing of the blacktop to enhance the useful life.

3) Copy of letter from Ciminelli Cowper Construction Management Co., dated 09/23/92, documenting the estimated total cost of construction of the new wing.

4) Copy of contract with Swanson for renovations of the old ICU unit which will become the recovery/anesthesia area. These costs replace the LDRP renovations that were covered in the C.O.N.

5) Summary of movable equipment to be utilized in the new recovery area.

(AR 908). The letter also referenced the fact that during a previous audit, in June of 1992, Bradford Hospital provided the intermediary with copies of the contracts and with the Certificate of Need documents from the Pennsylvania Department of Health (AR 908, 1190, 1271–1324).

On February 15, 1993, the intermediary notified Bradford of its "Final Hospital Specific Rate (HSR) for Capital–Related Costs." (AR 911–12) It found that the final rate was $274.64 per discharge and concluded that since the hospital-specific rate was lower than the federal rate, Bradford Hospital would be reimbursed according to the fully prospective payment method (AR 911). Subsequently, on September 30, 1993,

the regulatory deadline for requesting a redetermination of the hospital-specific rate, Bradford Hospital filed its cost report for the fiscal year that ended June 30, 1993 (AR 1054). The cover letter noted that the report was prepared under the fully prospective methodology, but added that they "requested to be reimbursed under the 'hold-harmless methodology' " and were "in the process of requesting revised capital payment methodology for fiscal year 1993." (AR 1054)

Almost one year later, on August 30, 1994, Bradford Hospital wrote to the intermediary (AR 918). The letter provided, "As we discussed a few months ago, Bradford Regional Medical Center, provider number 39–01118, requests a final determination of its hospital specific capital rate for fiscal year ended June 30, 1993, based on its cost report for the same period." (AR 918) The letter resubmitted the June 1993 cost report and included a computation of the final redetermined rate (AR 918). It also provided, "All other documentation relating to the new construction was provided to your audit staff during their audit of our old capital costs, including contracts, estimated construction costs, etc." (AR 918)

A week later, on September 8, 1994, the intermediary denied the August 30, 1994 request for a redetermination of the capital hospital-specific rate (AR 1002–03). It noted that section 2807.4 of the Provider Reimbursement Manual requires that a request for redetermination include the hospital's calculation of the redetermined rate and that the request be filed with the intermediary "no later than the date the cost report must be filed." (AR 1002) The intermediary determined that Bradford Hospital's request was untimely because it was not complete until the hospital submitted its computation of the rate in August of 1994, after the deadline for the filing of a cost report (AR 1002).[3]

---

**3.** On September 30, 1994, the hospital submitted a request for redetermination of the hospital-specific rate for the fiscal year ended June 30, 1994. (AR 661). This request, unlike

The hospital appealed the intermediary's decision to the Provider Reimbursement Review Board ("Board") on March 6, 1995 (AR 61–72).[4] It argued that the September 1993 letter to the intermediary was a timely redetermination request (AR 65). It acknowledged that the letter was missing an estimate of the redetermined rate but maintained that it was prevented from complying with that requirement because the intermediary did not comply with its obligation under section 412.302(c)(1)(vii) (AR 65). Alternatively, it argued that the intermediary's failure to comply with the regulations equitably tolled the deadline for filing the request (AR 66). Conversely, the intermediary argued that it was not required to issue an obligated capital determination under section 412.302(c)(1)(vii) because the hospital did not supply the supporting documents required by section 412.302(c)(1) in a timely manner (AR 68). It also argued that the September 1993 did not constitute a redetermination request because it did not expressly use the term "redetermination" and it did not include an estimate of the redetermined rate. It maintained that "regardless of its own failure to provide the obligated capital required by 42 C.F.R. § 412.302(c)(1)(vii), the Provider was still required to submit its redetermination request no later than [September 30, 1993]." (AR 69)

On January 7, 1999, the Board reversed the intermediary's decision (AR 72). First, the Board found that the hospital filed the supporting documents required for an obligated capital determination in a timely manner; it concluded that the information supplied in June of 1992 and September 1992 met the requirements of section 412.302(c)(1) (AR 70). Second, the Board

concluded that the September 1993 letter was a timely request for redetermination of the hospital specific rate; it stated if the request was incomplete, "only an estimate of a redetermined rate was missing." (AR 71) Third, relying on language from the Federal Register, the Board found that "the intermediary's decision to reject or recognize obligated capital costs was essential to the provider's ability to fulfill its obligation under the regulations." (AR 71) It concluded that the intermediary's failure to issue an obligated capital determination violated the regulations and "led to the Provider's incomplete redetermination request." (AR 71) Finally, the Board held in the alternative that the agency's failure to issue an obligated capital determination equitably tolled the deadline, rendering the hospital's August 30, 1994 letter a timely request for redetermination (AR 71).

Both the intermediary and the HCFA's Center for Health Plans and Providers requested that the Administrator of the HCFA review the Board's decision (AR 51, 54–57). The Administrator did so and reversed the Board's decision (AR 23). First, the Administrator disagreed with the Board and found that the September 1993 letter was not a redetermination request because it only stated that the hospital was "in the process of requesting" a revised hospital-specific rate (AR 16). Second, the Administrator held that the record did not support the Board's conclusion that the hospital was prevented from filing a complete redetermination request by the intermediary's failure to rule on the obligated capital request (AR 16–17). He noted that the evidence did not show that the hospital

the one for fiscal year 1993, was granted by the intermediary on November 23, 1994 (AR 661–62). The intermediary stated that the recalculated rate was $493.73 (AR 661). Since that rate was above the federal standard rate, it concluded that the methodology should be changed to hold harmless.

4. On March 3, 1995, the intermediary issued the Notice of Program Reimbursement for

Bradford Hospital for the fiscal year ending June 30, 1993 (AR 1155). The hospital subsequently appealed both the denial of the request for a redetermined rate and the Notice of Reimbursement to the Provider Reimbursement Review Board ("Board"). The Board consolidated the appeals and held a hearing on September 10, 1998 (AR 182, 844).

was having difficulty filing a request because of the intermediary's inaction and he pointed out that the hospital was able to compile an estimate in August 1994 even though the agency had still not ruled (AR 17). In response to the hospital's argument that it would only have been able to file an inaccurate estimate in September 1993, the Administrator stated that the regulations and the word "estimate" contemplate inaccurate and unaudited requests (AR 17). He concluded that in light of this, the provider is not harmed if the intermediary does not rule on the obligated capital request before the request for redetermination is due (AR 17). Finally, the Administrator held that the Board was incorrect in concluding that the August 1994 request was timely under equitable tolling principles (AR 18). The Administrator's reasons for this conclusion will be set forth in more detail below.

Bradford filed a Complaint with this Court on May 14, 1999. It seeks judicial review of the Administrator's decision, which is the final decision of the Secretary of Health and Human Services. Both parties have since filed motions for summary judgment.

## II. STANDARD OF REVIEW

Judicial review of the Secretary's decision is governed by 42 U.S.C. § 1395oo(f), which incorporates the standard of review of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 511, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Butler County Mem'l Hosp. v. Heckler,* 780 F.2d 352, 355–56 (3d Cir. 1985). Accordingly, we must uphold the agency determination unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C.A. § 706(2)(A) (West 1996 & Supp. 2000).

■ In determining whether the agency acted arbitrarily and capriciously, "a court may not substitute its judgment for that of an agency, but must determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State of New York Dep't of Soc. Servs. v. Shalala,* 21 F.3d 485, 492 (2d Cir.1994) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "Grounds for concluding that the agency acted arbitrarily and capriciously include its reliance on factors outside those Congress intended for consideration, a complete failure by the agency to consider an important aspect of the problem, or an agency's explanation that is contrary to, or implausible in light of the evidence." *Harrisburg Hosp. v. Shalala,* 48 F.Supp.2d 467, 472 (M.D.Pa.1999) (citing *Fertilizer Institute v. Browner,* 163 F.3d 774, 777 (3d Cir.1998)).

■ The Court must give substantial deference to an agency's interpretation of its own regulations. *See Commonwealth of Pennsylvania v. United States Dep't of Health and Human Servs.,* 101 F.3d 939, 944 (3d Cir.1996) (quoting *Elizabeth Blackwell Health Ctr. for Women v. Knoll,* 61 F.3d 170, 183 (3d Cir.1995)). We must defer to the agency's interpretation "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381; *see Commonwealth of Pennsylvania,* 101 F.3d at 944. Deference to the agency's interpretation "is all the more warranted when ... the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' " *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)).

■ Moreover, "[w]e may overturn the Secretary's decision if his factual determinations are not supported by substantial evidence." *City of Camden v. United States Dep't of Labor*, 831 F.2d 449, 450 (3d Cir.1987). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Seidman v. Office of Thrift Supervision*, 37 F.3d 911, 924 (3d Cir.1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1994)). It is " 'more than a mere scintilla' but 'less than the weight of the evidence.' " *Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*, 992 F.2d 474, 480 (3d Cir.1993) (quoting *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. 206).

Plaintiff argues that we must consider and give deference to the Board's determination, as well as that of the Administrator. It cites *Central Washington Health Services Association v. Harris*, 497 F.Supp. 1143, 1152 (E.D.Wash.1980), for the following proposition: "[I]n determining whether the Administrator's decision in turn is supported by substantial evidence, the Court should consider and review the decision of the P.R.R.B." *Id.* at 1152 (citing *Fairfax v. Califano*, 585 F.2d 602 (4th Cir.1978) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

■ In accordance with the cases cited by the Plaintiff, we will consider the findings of fact of the Board and the Administrator, as well as the entire administrative record, in assessing whether the Secretary's decision is supported by substantial evidence. We stress, however, that our standard of review of the factual findings of the Secretary remains the same; we review the final decision of the Secretary—the Administrator's decision—and consider whether it is supported by substantial evidence. *See Universal Camera*, 340 U.S. at 496, 71 S.Ct. 456 ("The 'substantial evidence' standard is not modified in any way when the Board and its examiner dis-

agree."); *Saint Mary of Nazareth Hosp. Ctr. v. Shalala*, 96 F.Supp.2d 773, 776 (N.D.Ill.2000) ("The fact that the PRRB and the Secretary may have reached different conclusions in this case does not diminish the deference due to the Secretary's final decision."); *Spartanburg Gen. Hosp. v. Heckler*, 607 F.Supp. 635, 641 (D.S.C.1985) ("[T]he deferential standard in this case is not lessened because the decision of the PRRB differed from that of the Secretary. The decision under review is the final agency determination, not that of the subordinate hearing officers.").

Additionally, we note, however, that the issue in this case turns primarily on conclusions of law rather than factual determinations. More specifically, the case essentially turns on the agency's interpretation of its own regulations. To the extent that the Board and the Administrator arrived at differing legal conclusions, our review and its corresponding deference must be confined to the final decision of the Secretary, that of the Administrator.

### III. DISCUSSION

Plaintiff argues that we should reverse the Administrator's decision because it is arbitrary and capricious, contrary to law and not supported by substantial evidence. It urges this Court to vacate the decision of the Administrator and reinstate that of the Board. We will address each of the Plaintiff's arguments in turn. Before we do, however, we reiterate that two dates are relevant to the issue before us. Pursuant to 42 C.F.R. § 412.302(c)(1)(vii)(B), the intermediary was required to advise Bradford Hospital by the end of June 1993 whether it would recognize the obligated capital as old capital. Pursuant to 42 C.F.R. § 412.328(f)(1)(iii), the hospital was required to submit its request for redetermination of the hospital-specific rate by September 30, 1993.

#### A. *Whether the September 1993 Letter Was a Redetermination Request*

Plaintiff first argues that the Administrator erred in holding that the September

1993 letter was not a timely request for redetermination of the hospital-specific rate. The letter provides, in pertinent part:

Please note that the cost report was prepared under the "fully prospective payment methodology" for capital costs. However, Bradford Hospital requested to be reimbursed under the "hold harmless methodology" since we had a construction project that was obligated prior to December 31, 1990. Details pertaining to the project were submitted to the auditors during their base year capital audit. We are in the process of requesting revised capital payment methodology for fiscal year 1993, since it is the first full year with the obligated capital costs. To that end, I would like to protect our right to appeal our capital payment methodology for fiscal year 1993.

(AR 1054).

Again, the Administrator held that although the letter was filed on September 30, 1993, the regulatory deadline, it did not constitute a complete redetermination request because (1) it merely stated that the hospital was "in the process of requesting revised capital payment methodology" and (2) it did not include an estimate of the redetermined rate (AR 16). The Administrator concluded that the hospital did not file a complete redetermination request until August 30, 1994, long after the applicable deadline (AR 16).

Plaintiff maintains that contrary to the Administrator's holding, the letter did constitute a redetermination request because it "clearly requested a change" in the payment methodology when it stated, "Bradford Hospital requested to be reimbursed under the 'hold harmless methodology' since we had a construction project that was obligated prior to December 31, 1990." (AR 1054) It also argues that "if Bradford was still 'in the process' of making a request, it was only because the intermediary had not fulfilled its regulatory duty of advising Bradford whether it was going to recognize as old capital Bradford's claimed obligated capital costs." Plaintiff's Reply Br. at 8. Further, Plaintiff acknowledges that the "request" was incomplete in that it did not contain an estimate; it appears to argue, however, that the omission is excused since it was caused by the intermediary's own failure to issue an obligated capital determination.

▉ We hold that the Administrator's conclusion was reasonable. The letter does not request that the intermediary redetermine the hospital-specific rate. As the Administrator noted, it merely indicates that the hospital is "in the process" of doing so. Further, the portion of the letter relied upon by Plaintiff does not request a change in the payment methodology; rather, it suggests that such a request was made in the past.[5] The Administrator's decision in this regard was not arbitrary or capricious.

## B. *Equitable Tolling*

Next, Plaintiff argues that the Administrator erred in refusing to equitably toll the deadline for filing the redetermination request and thereby render the August 30, 1994 submission timely. The Administrator reversed the Board's decision in this regard for three separate reasons, each of which we will address below.

### 1. Whether Equitable Tolling Applies to Regulatory Deadlines

First, citing *Irwin v. Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Administrator held that the equitable tolling doctrine is inapplicable to regulatory filing deadlines. He concluded that the doctrine is limited to deadlines for judicial rather than administrative proceedings.

5. Since we conclude that the September 1993 letter did not constitute a redetermination request, we need not address whether its failure to include an estimate is excused. However, we note that this argument is very similar to Plaintiff's equitable tolling argument.

In *Irwin*, the Supreme Court reversed a long-standing principle that equitable tolling was never available against the government. *See id.* at 93–96, 111 S.Ct. 453. It held that the statute of limitations applicable to Title VII employment discrimination suits could be equitably tolled against the United States in the same manner as it could be tolled against a private employer. *See id.* The Court concluded that this rule did not infringe upon the doctrine of sovereign immunity. *See id.* at 95–96, 111 S.Ct. 453. It stated, "Once Congress has [waived sovereign immunity], we think that making the rule of equitable tolling applicable to *suits* against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver." *Id.* at 95, 111 S.Ct. 453 (emphasis added).

In support of the Administrator's conclusion, Defendant argues that the Supreme Court's use of the term "suit" in *Irwin* limited its application to lawsuits in court so that it does not extend to administrative proceedings. We agree with the Plaintiff, however, that despite the use of the word "suit", the Court in *Irwin* did not distinguish between lawsuits in court and administrative proceedings. The issue simply did not arise in *Irwin*.

Moreover, our research has revealed that numerous courts have applied equitable tolling to regulatory filing deadlines. *See, e.g., Rager v. Dade Behring, Inc.,* 210 F.3d 776, 779 (7th Cir.2000) (holding that equitable tolling is applicable to a Family and Medical Leave Act regulation which requires the employee to submit physician certification within 30 days); *Von Eye v. United States,* 92 F.3d 681, 684 (8th Cir. 1996) (concluding that equitable tolling applies to Food Security Act regulation which requires that conversion activities be completed by January 1, 1995); *Johnson v. Runyon,* 47 F.3d 911, 914 (7th Cir.1995) (applying equitable tolling to EEOC regulation that requires claimant to "initiate contact with a Counselor within 45 days of the date of the matter alleged to be dis-criminatory."); *Bayer v. United States Dep't of Treasury,* 956 F.2d 330, 332 (D.C.Cir.1992) (holding that EEOC regulation that requires complaint to be filed with counselor within 30 days of alleged discriminatory event is subject to equitable tolling); *Weber v. Henderson,* No. Civ. A. 99–2574, 2000 WL 217676, at \*1 (E.D.Pa. 2000) (holding that equitable tolling may apply to EEOC regulation which requires claimant to bring claim to attention of counselor within 45 days of the date of the discriminatory event). Therefore, we disagree with the Administrator and conclude that equitable tolling is generally applicable to regulatory filing deadlines.

## 2. Whether Section 412.328(f)(1)(iii) is Subject to Equitable Tolling

The Administrator also held, relying on *United States v. Brockamp,* 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997), that equitable tolling does not apply to section 412.328(f) of the Medicare regulations because that provision "sets forth its limitations in a highly detailed technical manner that, linguistically speaking, cannot be easily read as containing implicit exceptions." (AR 21)

The issue in *Brockamp* was whether the courts can toll "the statutory time ... limitations for filing tax refund claims set forth in § 6511 of the Internal Revenue Code of 1986[.]" *Id.* at 348, 117 S.Ct. 849. The plaintiff taxpayers in that case had overpaid on their taxes. *See id.* at 348, 117 S.Ct. 849. Several years after the relevant statutory time period had ended, the each filed an administrative claim for a refund of the overpayment. *See id.* When the administrative claim was denied as untimely, they filed suit in federal court and asked the court to equitably toll the limitations period due to the existence of a mental disability. *See id.* Plaintiffs, relying on *Irwin*, argued that equitable tolling applied to suits against the government. *See id.*

The Supreme Court held that Congress did not intend the equitable tolling doctrine to apply to the limitation periods

contained in section 6511. *See id.* at 352, 117 S.Ct. 849. The Court concluded that unlike most time limitation provisions, section 6511 is very complicated and convoluted. *See id.* at 350, 117 S.Ct. 849. "It sets forth its limitations in a highly detailed technical manner, that, linguistically speaking, cannot easily be read as containing implicit exceptions." *Id.* at 351, 117 S.Ct. 849. According to the Court, the provision "reiterates its limitations several times in several different ways", including in both procedural and substantive forms. *Id.* at 351–52, 117 S.Ct. 849. It also "sets forth explicit exceptions to its basic time limits, and those very specific exceptions do not include 'equitable tolling.' " *Id.* at 351, 117 S.Ct. 849. The Court concluded that "[t]o read an 'equitable tolling' exception into § 6511 could create serious administrative problems by forcing the IRS to respond to, and perhaps litigate, large numbers of late claims, accompanied by requests for 'equitable tolling' which, upon close inspection, might turn out to lack sufficient equitable justification." *Id.* The Court stated: "The nature and potential magnitude of the administrative problem suggest that Congress decided to pay the price of occasional unfairness in individual cases ... in order to maintain a more workable tax enforcement system." *Id.*

■ Section 412.328(f)(1)(iii), the regulation at issue in this case, provides as follows:

The hospital must request a redetermination in writing no later than the date the cost report must be filed for the first cost reporting period beginning on or after October 1, 1991 or the cost reporting period that will serve as the new base period, whichever is later. The hospital's redetermination request must include the cost report for the new base period and an estimate of the revised hospital-specific rate indicating that the

new rate exceeds the hospital's current hospital-specific rate.

42 C.F.R. § 412.328(f)(1)(iii) (1999). We agree with the Plaintiff that section 412.328(f)(1)(iii) is distinguishable from the provision in *Brockamp*. Unlike the tax code provision in that case, section 412.328(f)(1)(iii) is not complicated. It simply requires that the request for redetermination be filed by the date that the first cost report is due after October 1, 1991. *See id.* Indeed, the medicare regulation at issue in this case is more analogous to the Title VII limitation provision in 42 U.S.C. § 2000e–16, which requires that a lawsuit for employment discrimination be filed within ninety days of receipt of a notice of final EEOC action. Again, in *Irwin*, the Supreme Court held that the Title VII provision is subject to equitable tolling. *See Irwin*, 498 U.S. at 95–96, 111 S.Ct. 453.[6] Therefore, we disagree with the Administrator and hold that the medicare regulation is not so detailed and technical that it cannot be read as containing an implicit exception for equitable tolling.

### 3. Whether Plaintiffs Meet the Requirements for Equitable Tolling

Finally, the Administrator held that even if section 412.328(f)(1)(iii) lent itself to the application of equitable tolling, the Plaintiff is not entitled to have the period tolled because (1) it did not actively pursue the timely filing of its redetermination request and (2) the record does not support a finding that the Bradford Hospital was induced or tricked by the agency's misconduct into allowing the filing deadline to pass.

■ It is well settled that "courts must be sparing in their use of equitable tolling." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 239 (3d Cir.1999); *see also Irwin*, 498 U.S. at 96, 111 S.Ct. 453 ("Federal courts have typically extend-

---

**6.** Following *Irwin*, in *Brockamp*, the Supreme Court used 42 U.S.C. § 2000e–16(c) as an example of an ordinary limitations statute that, unlike section 6511, "uses fairly simple language, which one can often plausibly read as containing an implied 'equitable tolling' exception." *Brockamp*, 519 U.S. at 350, 117 S.Ct. 849.

ed equitable relief only sparingly."). Use of the doctrine "is proper only when the 'principles of equity would make the rigid application of a limitation period unfair.' " *Jones v. Morton*, 195 F.3d 153, 159 (3d Cir.1999) (quoting *Miller v. New Jersey State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir.1998)). Equitable tolling is permitted in the following situations: (1) "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period" or (2) "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing of the deadline to pass." [7] *Irwin*, 498 U.S. at 96, 111 S.Ct. 453. Courts should be "less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights." *Id.* "[T]he principles of equitable tolling ... do not extend to what is at best a garden variety claim of excusable neglect." *Id.*

Plaintiff argues that we should apply equitable tolling because it was prevented from filing a complete redetermination request by the Defendant's failure to make a determination regarding obligated capital. It maintains that section 412.302 of the regulations requires that the agency make a determination regarding obligated capital before the provider submits its request for redetermination of the hospital-specific rate. It also maintains that this determination is crucial for the filing of a redetermination request because without it a provider cannot submit the estimate that is required by section 412.328(f)(1)(iii).

The Defendant admits that it did not supply Plaintiff with a determination regarding obligated capital but argues that this omission did not prevent the hospital from submitting an estimate. According to Defendant and the Administrator, an inter-mediary's determination regarding obligated capital is not a condition precedent to a request for reconsideration. Rather, the "estimate" required by 412.328(f)(1)(iii) is just a rough approximate of the new rate whose purpose is merely to reduce the incidence of unwarranted requests. Defendant argues that the Plaintiff should have submitted a timely estimate without an obligated capital determination by either interpreting the standards for recognizing obligated capital on its own or including all of the old capital in the estimate.

Before we may address the issue of whether the regulation at issue was equitably tolled, we must first determine whether the Administrator's interpretation of its own regulations, set out above, was arbitrary and capricious. Again, we must give substantial deference to the agency's interpretation of its own regulations. *See Commonwealth of Pennsylvania v. United States Dep't. of Health and Human Servs.*, 101 F.3d 939, 944 (3d Cir.1996) (quoting *Elizabeth Blackwell Health Ctr. for Women v. Knoll*, 61 F.3d 170, 183 (3d Cir. 1995)). We must defer to that interpretation "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see Commonwealth of Pennsylvania*, 101 F.3d at 944.

 We hold that the Administrator's interpretation of its own regulations was arbitrary and capricious. Contrary to that interpretation, the Medicare regulations clearly provide that the intermediary's decision to reject or recognize obligated capital costs must be made prior to the provider's filing of a redetermination request. Indeed, the Secretary's intent in this re-

---

**7.** The Third Circuit has repeatedly held "that equitable tolling 'may be appropriate if (1) the defendant has actively misled the plaintiff, (2) if the plaintiff has in some extraordinary way been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum.' " *Jones*, 195 F.3d at 159 (quoting *United States v. Midgley*, 142 F.3d 174, 179 (3d Cir.1998)); *see also Kocian v. Getty Refining & Mktg. Co.*, 707 F.2d 748, 753 (3d Cir.1983).

gard is reflected in its summary of a final rule in revising the regulations. The HCFA described the process as follows:

> Hospitals that will be affected by the rules for recognition of obligated capital must advise their intermediary in writing of the existence of obligated capital no later than 90 days after the start of their first cost reporting period under the capital prospective payment system. The hospital must submit supporting documentation to substantiate that the capital was obligated as of December 31, 1990, the scope of the project and the amount of the obligation. For construction projects, the hospital must submit documentation regarding estimated total construction and interest costs. *So that hospitals will know in advance whether a project will be recognized as old capital* and the limitation on the total project cost that will be recognized, the intermediary will advise the hospital of its determination before the close of the hospital's first 12 month cost reporting period under the capital prospective payment system.

56 Fed.Reg. 43,358, 43,394 (1991).

As the intermediary's own witness testified during the Board hearing, hospitals need to know in advance whether a project will be recognized as old capital so that they may perform their obligation to estimate the redetermined rate [8] (AR 296, 299, 301–02). Further, the Administrator's contrary interpretation would effectively render the intermediary's obligations under section 412.302 of the regulations superfluous.

██ It is well settled law that an agency is bound by and must follow its own regulations. *See United States, ex. Rel. Farese v. Luther,* 953 F.2d 49, 52 (3d Cir.1992); *Marshall v. Lansing,* 839 F.2d 933, 943 (3d Cir.1988); *Frisby v. United States Dep't of Hous. and Urban Dev.,* 755 F.2d 1052, 1055 (3d Cir.1985); *Township of*

*South Fayette v. Allegheny County Hous. Auth.,* 27 F.Supp.2d 582, 595 (W.D.Pa. 1998). Section 421.100(h) of the regulations provides, "The intermediary must comply with all applicable laws and regulations." 42 C.F.R. § 421.100(h) (1999). However, in this case, it is undisputed that the Administrator failed to comply with section 412.302(c)(1)(vii)(B) of the regulations (AR 307). That section required that the intermediary issue an obligated capital determination by the end of June 1993 (AR 291). To this date, the intermediary has not issued such a ruling (AR 282).

In this regard, numerous courts have applied equitable tolling when the agency's failure to follow its own regulations causes the plaintiff to miss a statutory or regulatory deadline. *See Perez v. United States,* 167 F.3d 913, 919 (5th Cir.1999); *Glarner v. United States,* 30 F.3d 697, 701 (6th Cir.1994); *Stanfill v. United States,* 43 F.Supp.2d 1304, 1310–11 (M.D.Ala.1999); *Bartus v. United States,* 930 F.Supp. 679, 682 (D.Mass.1996); *see also Kocian v. Getty Ref. & Mktg. Co.,* 707 F.2d 748, 753 n. 8 (3d Cir.1983) (suggesting that the EEOC's failure to defer a claim to the state agency as required by the regulations would constitute grounds for equitable tolling in a Title VII action). For example, in *Glarner v. United States,* 30 F.3d 697 (6th Cir. 1994), a veteran contacted the Veteran's Administration ("VA") and "told an officer that he believed he was totally disabled as a result of his medical treatment and wanted to file a negligence claim against the hospital." *Id.* at 699. In accordance with the VA employee's instructions, the veteran completed an application for disability benefits rather than the Standard Form 95 ("SF95") that a claimant must file to institute a negligence suit. *See id.* Thereafter, the veteran's "disability" claim progressed all the way through the administrative process and when the veteran realized that he had filled out the wrong form, he filed suit.

---

8. In addition to the intermediary's witness, Bradford Hospital's witness testified that in order to provide an estimate of the redeter-

mined rate, a hospital needs to know which projects will be recognized as obligated capital (AR 242, 258).

*See id.* However, the district court dismissed his claim as barred by the statute of limitations. *See id.* On appeal, the Sixth Circuit reversed. It held that the limitations period was equitably tolled because the VA failed to perform its regulatory duty to provide the veteran with an SF95 form. *See id.*

Similarly, in *Perez v. United States,* 167 F.3d 913 (5th Cir.1999), on September 29, 1990, the plaintiff was knocked unconscious by a camouflage netting pole which was set into motion by the carelessness of an armored personnel carrier of the Texas National Guard. *See id.* at 914. After the accident, the plaintiff's lawyer wrote a letter to the Texas National Guard describing the incident and inquiring as to the procedure for submitting a claim. *See id.* A year later, the plaintiff filed suit against the Texas National Guard and the carrier. *See id* However the suit was dismissed by the court in 1995. *See id.* During the course of the litigation, the plaintiff learned that the guardsmen were acting as employees of the United States Army while on duty at the festival. *See id.* On June 30, 1995, she filed a claim with the Army which was denied as barred by the two year statute of limitations of the Federal Tort Claims Act. *See id.* On appeal, the Fifth Circuit noted that section 536 of title 32 of the regulations "placed a duty on the National Guard to forward a claims form to" the plaintiff. *Id.* The court equitably tolled the limitations period because the National Guard's failure to follow its own regulations caused the plaintiff to file an "improper" complaint. *Id.* at 919. The court reasoned that it is appropriate to toll limitations periods "when there has been fraudulent concealment of information that the plaintiff would need to file correctly." *Id.* at 918.

■ As in *Glarner* and *Perez,* we conclude that Bradford Hospital was prevented from filing a complete request for redetermination by the agency's failure to follow its own regulations. A representative from Bradford Hospital testified at the Board hearing that he did not submit a complete redetermination request on or before the regulatory deadline because he did not know which costs the intermediary would recognize as obligated capital (AR 241–42, 258–261). Therefore, because the intermediary's violation of the regulations caused the plaintiff to miss the regulatory deadline, equitable tolling of the regulatory deadline is appropriate.[9]

## IV. CONCLUSION

We agree with the Administrator that the hospital's September 30, 1993 letter to the intermediary did not constitute a timely request for redetermination of the hospital-specific rate. However, we hold that the Administrator's refusal to toll the regulatory deadline in section 412.328(f)(1)(iii) was arbitrary and capricious and contrary to law. Equitable tolling of that deadline is appropriate in this case because the hospital was prevented from complying with it by the intermediary's failure to provide a determination regarding obligated capital pursuant to section 412.302.

The final decision of the Secretary denying the Plaintiff's request for a redetermination of its hospital-specific rate as un-

---

**9.** Defendant argues that equitable tolling should not apply here because " 'the claimant failed to exercise due diligence in preserving his legal rights.' " Defs.Br. at 40 (quoting *Irwin,* 498 U.S. at 96, 111 S.Ct. 453). We disagree. The Plaintiff in this case did not sleep on its rights. It took the first step in the redetermination process by petitioning for a ruling regarding obligated capital. It also notified the Defendant, prior to the regulatory deadline, of its intent to request a redetermination of the hospital-specific rate. *See Bur-*

*nett v. New York Central R. Co.,* 380 U.S. 424, 429, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965) (holding that plaintiff "did not sleep on his rights" because he filed suit within the limitation period, only in the wrong court); *Perez v. United States,* 167 F.3d 913, 918 (5th Cir. 1999) (holding that the case was not a "garden variety claim of excusable neglect" because "the plaintiff took some step recognized as important by the statute before the end of the limitations period.").

timely is reversed and the decision of the Provider Reimbursement Review Board is reinstated insofar as it relies on equitable tolling. The case is remanded to the Secretary for a redetermination of the Plaintiff's hospital-specific rate. An appropriate order follows.

### ORDER

AND NOW, this 5th day of June 2000, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 9] is GRANTED, and Defendant's Motion for Summary Judgment [Doc. No. 12] is DENIED.

The Decision of the Administrator of the Health Care Financing Administration is REVERSED and the case is REMANDED to the Secretary for further proceedings consistent with the accompanying Memorandum Opinion.